[No. 4,371.]

## IN THE MATTER OF THE ESTATE OF JEAN BAPTISTE BAUBICHON.

CONSTRUCTION OF ANTE-NUPTIAL CONTRACT.—If, in an ante-nuptial contract, there are several articles, and if, in construing the same, to attach a clause of one article to another article would make the article to which it is attached contradictory, such clause will be held applicable only to the article in which it is found.

INHERITANCE UNDER ANTE-NUPTIAL CONTRACT.—If, in an ante-nuptial contract, made in France, each of the future spouses gives or conveys to the survivor of them all the property which the first one dying shall leave, except what the law gives to the children of the marriage, the children take, not under the contract, but under the law, and if the survivor of the spouses dies in this State, leaving property here, the same will be distributed by the Probate Court in accordance with the statutes of this State.

DISTRIBUTION OF ESTATE BY PROBATE COURT.—In the absence of an ante-nuptial contract, property in this State left by a foreigner, dying in this State, and leaving children, must be distributed in accordance with the statutes of this State.

APPEAL from the Probate Court of the City and County of San Francisco.

Marguerite, the wife of the decedent, died in France, on the 3d day of December, 1870; the decedent died in Cal-

ifornia some months after, and his will was presented for probate on the 2d day of October, 1871.

One of the executors, Joseph Begue Bidau, filed a petition for a distribution of the estate, on the 22d day of October, 1873. All the property sought to be distributed was acquired by the personal labor of Jean Baptiste Baubichon in the State of California after he separated from his wife in France. The Court below distributed the property according to the provisions of the will.

The other facts are stated in the opinion.

*Paul J. Robert* and *H. C. Newhall,* for the Appellants.

The deceased intermarried in France in 1838, with Margaret Dutrech, and executed the marriage contract set forth in the petition. Two children were born. Subsequently decedent leaves France, abandoning his wife and children; arriving in this State he acquires property; and upon his death leaves a will in which he mentions his wife and children (leaving to each one dollar), and bequeaths his property to collateral heirs. The will is probated and the children oppose distribution, claiming under the marriage contract to be entitled to two thirds of said estate. The *lex loci contractus* governs. (Story on Conflict of Laws, Secs. 143, 276; *Feaubert* v. *Tuft,* Freick's Ch. Prac. 207; *Anstrucher* v. *Adair,* 2 Mylue and Keen, 513; *Deconche* v. *Savetier,* 3 Johns. 190; *LeBreton* v. *Miles,* 8 Paige, Ch. 261; *Fremoult* v. *Dedire,* 1 Pr. Wms. 249; Robertson's Appeal Cases, Scotch, 3; 1 Brown's Par. Cases, 38.)

This being a contract made in France, between French citizens, in accordance with the French law, the Code Napoleon became thereby embodied in it as a part of the contract, as though expressly written in the contract in *hoc verba.* (*Camfranque* v. *Burnell,* 1 Washg. C. C. R. 341; *Gordon* v. *Dalrymple,* Scotch case; *Thompson* v. *Ketchum,* 8 Johns. 190; 31 Eng. Law and Eq. 443.)

By the Civil Law and Code Napoleon, children acquired vested rights in the acquisitions of their parents, which could not be divested by the acts of parents, except for

certain causes prescribed. Code Napoleon, says: "Donations, either by act, *inter vivos* or *causa mortis*, cannot exceed one half of the estate of the testator, if he leaves at his death one legitimate child; one third if he leaves two children, and one fourth if he leaves three, or a greater number." (Code Napoleon, Sec. 913 and 920; Louisiana Code, Art. 1482 and 1489.)

These heirs are called forced heirs, and can only be disinherited for cause. (Louisiana Code, Art. 1609; Code Napoleon, Sec. ——; see, also, Title on Successions, 2 Domat's Civil Law, pp. 3 to 28.)

The expression in Article three of the Marriage Contract, translated as "in full property and usufruct," or "enjoyment," is defined in the Civil Law and Code Napoleon to be the right to enjoy and dispose of one's property in the most unlimited manner; *provided*, it is not used in a way prohibited by law or ordinances. (Code Napoleon, Art. 544; Louisiana Code, Art. 483; 1 Domat's Civil Law, 409.)

*Edward J. Pringle*, for the Respondent.

It may be taken as a standpoint for the argument in this case that, without a marriage contract the contestants can have no case; the state of facts being, that a resident and citizen of this country makes a will, valid according to the laws of California, leaving children in France, to each of whom he leaves one dollar.

Without a marriage contract, the laws of France could not be invoked to control the succession here. Such contract must operate in contravention of the ordinary laws in force here, controlling the property wherever the parties may reside. I admit that the contract must be interpreted according to the laws of France. We must look to those laws for the true legal meaning of the words, to see them in their surroundings.

Instead of operating, or purporting to operate in favor of the contestants, the contract is wholly against them and in favor of the free disposition by the testator of the property in question. The first article is this: "The future

spouses declare that they renounce as well the dotal regime as the legal community." The second article provides that the mother of the wife gives certain articles of furniture to her daughter. The third article begins: "There shall be between the future spouses a community of acquisitions, which shall be regulated according to the provisions of articles one thousand four hundred and ninety-eight and one thousand four hundred and ninety-nine of the Civil Code." What are articles one thousand four hundred and ninety-eight and one thousand four hundred and ninety-nine of the Civil Code? These articles, (one thousand four hundred and ninety-eight and one thonsand four hundred and ninety-nine,) will be found to refer to an artificial or conventional community reduced to the acquisitions of the marriage.

1498.—" When the spouses expressly agree that there shall be between them a community of acquisitions only, they are deemed to exclude from the community both the individual debts of each, present and future, and the movables present and future of each party.

"In this case, and after each of the spouses has taken away the personal chattels, duly proved, which he or she brought to the marriage, the community of interest is limited to the acquisitions made by the spouses, together or separately, during marriage, and arising as well from their joint business as from the savings laid up by them from the rents and profits of the property of the two spouses."

1499.—"If the movables in existence at the time of marriage, or since accrued, have not been determined by an inventory or schedule, correctly made out, they are deemed to be acquisitions."

The purpose of these two articles, it will be seen, is not to treat of any disposition of the common property, but only of its extent. They limit the extent of the community property, or rather they recognize the right of the parties to change by stipulation the extent of the community property. Without any stipulation between the parties, what was the legal community?

See articles one thousand four hundred and one thousand

four hundred and one of the Code: "A legal community which is established by the simple declaration that persons are married in the regime of the community, or in default of any contract, is subject to the rules in three following sections: The legal community is composed actively, first, of all the movables that the spouses possessed on the day of the celebration of the marriage; also of all movables that fall in to them during the marriage by title of succession or donation, if the donor has not expressed a contrary intention. Secondly, of all the rents, profits, interest and arrears, of whatever nature they may be, accruing or collected during marriage, and arising from the property which belonged to the spouses at the time of its celebration, or from such as has accrued to them during marriage by virtue of any title whatsoever. Thirdly, of all the immovables which have been acquired during the marriage."

This was the legal community proper, as distinguished from the conventional community depending upon contract of the parties. The object, therefore, of the third article of this contract in its first expression or clause, is to reduce the reach or extent of the legal community, and to confine it strictly to the acquisitions subsequent to the marriage. "There shall be between the future spouses a community of acquisitions which shall be regulated as expressed in articles one thousand four hundred and ninety-eight and one thousand four hundred and ninty-nine of the Code."

It reduces, we see, the domain of the common property, from the broad extent of the legal community to the narrow limit of the acquisitions of the marriage. Then comes the clause: "This community is further agreed upon under the express condition that the whole of the said acquisition shall belong to the survivor of the future spouses in full property and usufruct, whether or not there be any children of the said marriage." This clause takes hold of the conventional property of the community reduced to the mere acquisitions of the marriage. It provides that the whole shall belong to the survivor of the future spouses in full property and enjoyment.

The husband has been in this country for twenty years,

and has acquired all of this property in this country. That, therefore, must come within the conditions of articles one thousand four hundred and ninety-seven and one thousand four hundred and ninety-eight of the Code, and within the purview of article third of the contract. It is a clear, positive expression that all of this property, all of these acquisitions, shall belong to the survivor of the two in full property and use.

We insist that the clear intention of the contract is all against the contestants. But, even if it were not so, in order to make it of any avail to them, see how extraordinary their argument is. Here is a contract that says: "I give to my husband all of the property which I have, except that part which the law gives to my children." They say that that is a donation to the children of that part which the law gives to them. We say it is only a donation to the husband of all that the wife could possibly give to him, saving what the law gave to the children. We say that, whatever the children get, they get from the law and not from the contract.

It seems to be too plain for argument that the wife is, and that the children are not party to this contract; that the wife does not assume to be giving to the children, but assumes to be giving to the husband. She says: "I give you everything that I can give, leaving safe or untouched the reduction prescribed by the law in favor of our children." If the children take anything, they take it against the contract, and not under it. How can it be said that these children are beneficiaries of that contract, if all the contract does is to recognize their rights as against the contract?

It is, in fact, the true intention of the parties that the contract was to pass to the surviving husband or wife all of the property, that under the law could pass to the survivor, whenever and wherever the contract took effect. When a wife or husband in a marriage contract say: "We give to the survivor of the two all of the property which we can give, and which the law does not reserve to our children," and the law changes the next day, would not the next day's

law be operative, and not the law of the time of the contract? Would not the children hold under the law at the time the contract took effect, and not at the time it was made? Would not the clear intention of the parties be, to give the one to the other, all of the property which the law, at the time that the contract is to take effect, can possibly give? Suppose the share of the children was, by a change in the law, enlarged after the contract made, would the children be restricted to the share accorded at the date of the contract? I might thus make the argument that, when the parties come into a new jurisdiction, and new property is acquired, the same effect would follow as if the French law was changed; and that those who changed the place of acquisition of property, changed the operative effect of the contract, as much as if time and a change of the law enlarged or diminished its effect. That, if the next day the French law would give other rights to the children than were then referred to, but not enforced by this contract, in the same way the change of residence of these parties, and the acquisition of property elsewhere, would give new effect to the contract under the *lex rei sitæ*, and not under the law of the place of the contract. That, inasmuch as it is the law which is restricting the force of the contract, and not the contract which is operating against the law, the force of the contract expands whenever or wherever the pressure of the law is relaxed. But there is one step even further that we can take in this argument, if that were necessary. I can show that, if what the contestants claim were true; if it were true that this word *sauf* or "saving" to the children the rights that the French law gives them, made this reservation of the existing law a part of the contract, even then the contract would not help them. Even if they could maintain that, instead of saying I give everything to the survivor, except what I cannot give him, the contract says: I give everything to the survivor that I can give him, and I give also to our children what the law gives to them; even in such case we should fall into the well recognized doctrine that where parties, in the calls of a contract, express what the law enacts and

make it a part of their contract, the contract itself is inoperative in the face of the law. It is in such case the law that operates, not the contract. In other words, if a man devises to his heir at law, the heir takes by descent and not by purchase. This is true beyond any controversy. Go back first to Blackstone. (1st vol. of Coolie's Edition, page 242.)

By the Court, McKINSTRY, J.:

The deceased and Marguerite Dutrech were married at Bordeaux, France, in the year 1838.

In view of the marriage they entered into a contract, which contained the following covenants:

"Article 1. The future spouses declare that they renounce both the dotal regime and the legal community.

"Art. 2. In consideration of the said marriage Mrs. widow Dutrech gives to Miss, the future spouse, the moveables hereinafter designated: a complete bedstead made of walnut, a paillasse, a mattress, a feather-bed, two blankets, with a wreath trimming of white cotton, a clothes-press, and a commode of walnut wood, the whole valued at three hundred francs. Mrs. widow Dutrech obligates herself to deliver these objects to the future spouses as soon as they will prefer not living with the said Mrs. Dutrech, it being understood that the value given the furniture shall not remove the ownership from the future wife.

"Art. 3. There shall be between the future spouses a community of acquisitions which shall be regulated by articles one thousand four hundred and ninety-eight and one thousand four hundred and ninety-nine of the Civil Code. This community is further agreed upon the express condition that the whole of the said acquisitions shall belong to the survivor of the future spouses in fee and usufruct, whether there be any children of the said marriage or not, and this not as a gift, but according to agreement as between partners.

"Art. 4. The future spouses reciprocally make donation in favor of the survivor of them of the universality of the

goods and rights of the nature of separate property, which the first one dying shall leave, except the reductions prescribed by law in case of descendants or ascendants surviving the first deceased spouse."

Jean and Marie Baubichon (afterward Marie Beyselance), the issue of said marriage, were born at Bordeaux in the years 1840 and 1842, respectively; in 1870—and prior to the death of Jean Baptiste, the deceased—the wife, Marguerite, departed this life.

The deceased died in San Francisco, whither he removed, his family remaining in France, prior to the death of his wife, leaving a last will and testament in words and figures following:

"In the name of God, amen! I, Jean Baptiste Baubichon, of the city and county of San Francisco, being of sound and disposing mind and memory, and desirous of settling my worldly affairs while I have strength and capacity so to do:

"Do make, publish and declare this to be my last will and testament, hereby revoking and making null and void, all other and former last wills and testaments by me made.

"As the executors of this, my last will and testament, I hereby nominate and appoint my friends, Joseph Begue of San Francisco, and Jean Mercy and Louis Bouvier of San José. And my will is, that my said executors be permitted to qualify and act as such executors without having to give any bond or other security whatever.

"I give and grant full and absolute power and authority unto my said executors to enter into possession of all my property, or to sell or convey the same; the said Mercy to sell my sheep; the said Bouvier to sell and convey my real estate in the county of Santa Clara; the said Begue to receive and collect all and singular the sums of money coming to my estate, and remit the same to my heirs hereinafter mentioned, without any control, supervision, decree or order by or from any Probate or other Court.

"I give, devise, and bequeath all and singular, my estate and property, real, personal and mixed, wheresoever situated and being, and of which I may die seized or pos-

sessed, or to which I may be entitled at the time of my death, unto my executors aforsaid, in trust and confidence, nevertheless, and to and for the following uses and purposes, to wit:

"To give, remit or deliver the sum of one dollar ($1) unto each—Marguerite Dutrech, to whom I was once married, and her child; Eugene and her child, Marie, all of Bordeaux.

"To give, remit and deliver the sum of two thousand dollars gold coin, unto each of my frends, Jean Mercy and Louis Bouvier, aforesaid.

"All the rest, residue and remainder of my estate aforesaid, after the payment and delivery of the above legacies, I direct my said executor, Joseph Begue, to divide into two equal portions, and to give, pay, remit and deliver one portion thereof to my sister, Francoise Baubichon at Saint Julien, Molie Molette, Dep. de la haute Loire, France; and to her child or children, in case of her death.   And the other portion to give, pay, remit and deliver unto. my brother Joseph Baubichon, at Bourg Argental, same department, and in case of his death, to his child or children.

"In witness whereof, I have hereunto set my hand and seal at the city of San Francisco, this 30th day of August, .1871.

J. B. BAUBICHON. [Seal]."

His son and daughter contested the distribution of the estate in the Probate Court of San Francisco, on the ground, that—by virtue of the ante-nuptial contract and the laws of France—the decedent could devise, bequeath, or dispose of only one third part of the estate in his name and possession; the contestants claiming that they were entitled to two thirds.

We think the last clause of the fourth article of the ante-nuptial contract is applicable only to the fourth article. To attach it to, and by construction make it a part of the third, would render that article contradictory, since, by the express terms of the third article, "the whole of the acquisitions" was to belong to the survivor of the spouses,

in full property and use, whether there should be any children of the marriage or not.

It is claimed, however, that—without reference to the last clause of the fourth article—the French law entered into and became part of the contract, and by that law the contestants acquired rights which could not be divested by the contract made in anticipation of the marriage; that the contestants were forced heirs, and could not thus be deprived of their inheritance.

It was admitted at the argument that the contestants would have no standing in a California Court, save for the ante-nuptial contract; but this admission was accompanied by the claim that the contract was void in so far as it attempted to deprive the children of the marriage of the share of the community property to which they were entitled as forced heirs.

The statement of the position taken by the contestants, indicates that their claim is not based on the contract, but is asserted against the contract.

The contestants urge, although the instrument (as they assert,) is void as against their claim to two thirds of the estate, and although they can claim only through the instrument void in the particular named, yet because the contract is to be interpreted in the light of the French law, this Court should determine that they are entitled to the same share that they would be held to be entitled to in a French Court, had the deceased died at the domicile of the marriage. But this is merely to ask that we should order the estate to be distributed, not in accordance with our own, but in accordance with the foreign law.

It was expressly admitted, and we think correctly admitted, that we are only authorized to direct distribution, in the absence of an ante-nuptial contract, in the manner required by the statutes of our State.

Decree affirmed. Remittitur forthwith.